IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

CITIZENS FOR A RESPONSIBLE            *
CURRICULUM, *et al.*
                Plaintiffs,            *

        v.            *            Civil Action No. AW-05-1194

MONTGOMERY COUNTY PUBLIC            *
SCHOOLS, *et al.*,
                Defendants.            *
                           *****

## MEMORANDUM OPINION

       This matter involves a dispute between Citizens for a Responsible Curriculum ("CRC") and Parents and Friends of Ex-Gays and Gays's ("PFOX") (collectively, "Plaintiffs") against Montgomery County Public Schools ("MCPS"), the Montgomery County Public Schools Board of Education ("MCPS Board"),[1] and Superintendent Jerry Weast ("Superintendent Weast") (collectively, "Defendants"). Specifically, Plaintiffs request that this Court enjoin Defendants from distributing and teaching materials allegedly endorsing a homosexual lifestyle (the "Revised Curriculum") to MCPS students in conjunction with their sexual education classes. On May 5, 2005, this Court held a hearing at which it heard from all of the parties in this matter. Currently pending before this Court is Plaintiffs' Motion for a Temporary Restraining Order [1], Plaintiffs' Motion to Waive Posting of Bond [3], and Defendants' Motion to Dismiss

---

       [1]The Court notes that, as Defendants point out, the legal entity that operates the Montgomery County Public Schools is the Board of Education of Montgomery County, not, as named by Plaintiffs, the Montgomery County Public Schools. For the purposes of this Opinion, the Court's references to MCPS Board reference the Board of Education of Montgomery County, which will be the entity enjoined by the temporary restraining order.

Pursuant to Rule 12(b)(1).  On May 5, 2005, the Court held an oral hearing in this matter.  For the reasons that follow, the Court will grant Plaintiffs a temporary restraining order, waive the posting of bond, and deny Defendants' Motion to Dismiss.

## I.   FACTUAL & PROCEDURAL BACKGROUND

CRC is a non-profit organization formed to oppose the implementation of the Revised Curriculum in MCPS.  Members of CRC include students and parents of students enrolled in MCPS, as well as taxpayers and other members of the community opposed to the Revised Curriculum.  CRC's members do not include any students who have opted into the Revised Curriculum.

PFOX is a non-profit organization based in Virginia, with a chapter in Montgomery County, which works to promote "an inclusive environment for the ex-gay community" and to "eliminate negative perceptions and discrimination against former homosexuals and lesbians."  PFOX believes and advocates that individuals can work to overcome their unwanted same-sex attractions.

In November 2002, the Montgomery County Public Schools Citizens Advisory Committee (the "CAC") recommended to the MCPS Board that the health education curriculum for Grade 8 and Grade 10 be revised to include information addressing "sexual variation."  Prior to that time, it was the policy of MCPS not to discuss homosexuality within the health education curriculum, and that if a student asked a question regarding sexual orientation, the staff was to respond in only a perfunctory manner.

The CAC consisted of various members of the community and other interested organizations.  Specifically, among CAC members was Ms. Jackie Rice, a PFOX representative.  The CAC formed a writing committee to develop a draft of the sexual variation curriculum.  The writing committee included two MCPS health education teachers, an MCPS school psychologist, two MCPS school counselors, a school-

community health nurse, a representative of the Montgomery County Mental Health Association, an MCPS coordinator of health education, and two members of the CAC.  From October 2003 through May 2004, the CAC considered the writing committee's proposed curriculum changes.

On November 9, 2004, the MCPS Board voted to approve the Revised Curriculum submitted by the CAC.  The Court has been provided with copies of the Revised Curriculum for Grade 8 and the Revised Curriculum for Grade 10.  Each Revised Curriculum consists of a detailed course outline and supplemental materials, such as brochures, worksheets, and the like, which teachers are to rely upon in creating their lesson plans.  The Grade 8 Revised Curriculum is divided into two sections: (1) Mental Health; and (2) Family Life and Human Sexuality.  The Grade 10 Revised Curriculum is divided into three sections:  (1) Mental Health; (2) Safety, First Aid, and Injury Prevention; and (3) Family Life and Human Sexuality.  In both cases, it is largely the contents of the Family Life and Human Sexuality unit, including the supplemental materials relevant to this unit, with which Plaintiffs take issue.  Specifically, Plaintiffs object to the Revised Curriculum's discussion of sexual orientation and sexual identity.

The Revised Curriculum begins the discussion of sexual orientation by describing the terms heterosexual, homosexual, lesbian, bisexual, transgendered, questioning, coming out, and intersexed.  The Content Outline explains that "[t]he definitions are to be presented to students as stated below — no additional information, interpretation or examples are to be provided by the teacher."

The Grade 8 Revised Curriculum contains a section entitled "Myths regarding sexual orientation," as follows:

Myth:    Homosexuality is a mental health disorder.
Fact:    All major professional mental health organizations affirm that homosexuality is not
         a mental disorder.

Myth:  If you are "straight," you can become a homosexual.
Fact:   Most experts in the field have concluded that sexual orientation is not a choice.

Myth:  A person is a homosexual if he or she has ever been sexually attracted to, or ever had sexual contact with someone of the same gender.
Fact:   Fleeting attraction or contact does not prove long-term sexual orientation.

Myth:  Children of homosexual parents/guardians will become homosexuals.
Fact:   Having homosexual parents/guardians does not predispose you to being homosexual.

Plaintiffs also object to several statements contained within the supplemental materials to the discussion of sexual identity in the Revised Curriculum.  Specifically, students are asked to discuss in small groups and fill out a "Myths and Facts" worksheet concerning sexual orientation.  The Myths and Facts worksheet, which asks the students to answer whether a given statement is true or false, and then provides them with the answer,[2] states, in pertinent part:

1.     I don't know any gay, lesbian, or bisexual people.

*You probably don't know any who are 'out' to you, although a significant percentage of the population is gay, lesbian or bisexual (Approximately 1 in 10).  That represents approximately 60,0000 [sic] people in Edmonton) [sic].*

2.     Homosexuality is abnormal and sick.

*According to the American and Canadian Medical Associations, "It is no more abnormal or sick to be homosexual than to be left-handed'. [sic] Homophobia rather than homosexuality should be cured.*

3.     Loving people of the same sex is immoral (sinful).

*Many religious denominations do not believe this.  For example, in 2002 the*

---

[2]The answer, contained on a separate page of the Myths and Facts worksheet, is here denoted by the use of italics.

*Anglican Church of Canada began ritual blessings of same-sex unions. What is universally understood is that intolerance and hatred is wrong.*

***

8.     Gay men, lesbians and bisexuals are promiscuous and cannot maintain long-term relationships.

*Gays, lesbians and bisexuals, like heterosexuals, form a variety of relationships lasting from one night to many years. We may question our definition of 'promiscuous'; heterosexuals had a 49 percent divorce rate in 1995, which suggests that there is nothing inherent in heterosexuality that maintains strong, long-term relationships.*

9.     Lesbians, gay men and bisexuals could change (become heterosexual) if they really wanted to.

*Most students [sic] indicate that those who are highly motivated to change their sexual orientation may change their behavior, but not the underlying attraction. In fact, it is often societal homophobia that forces people to attempt to change.*

10.    Lesbians, gay men and bisexuals do not make good parents.

*One out of four families has a lesbian, gay or bisexual in the immediate family. Heterosexual parents are consistently not found to be more loving or caring than gay parents.*

11.    Lesbians, gay men and bisexuals have the same constitutional rights and opportunities as everyone else.

*In Canada in 2002, bisexuals, gays and lesbians are denied the spousal benefits enjoyed by heterosexuals. There are many more examples of special rights for heterosexuals.*

12.    HIV infection is a 'gay' disease.

*Although the majority of people infected with HIV in Canada are gay men, other groups are catching up. Heterosexual women (17-30 years old), and intravenous drug users are the fastest growing populations who are infected. Worldwide, there are many times more cases of AIDS in heterosexuals than*

*in homosexuals.*

The Revised Curriculum also incorporates a "Myths And Facts" handout, which MCPS appears to have pulled off of the website of the Family Pride Coalition, a group dedicated to "[e]quality for lesbian, gay, bisexual and transgender parents and their families." This handout contains a section entitled "Morality," which reads as follows:

**Myth:** Children raised by gay men and lesbians will be exposed to an "immoral" environment.

**Fact:** Morality is concerned with principles of "right" and "wrong" behavior.

The issue of morality is an important conversation ... However, morality is a more subjective issue. Often, families develop a moral structure based on their religious associations or social convictions. Because morality is based on beliefs and values, they differ with different communities, environments, histories and experiences. It is a philosophical question. Just as in unreasonable [sic] to say that a Jewish family is morally superior to a Catholic family, it is unreason-able [sic] to say a gay, lesbian, bisexual or transgender parent is of lesser moral fiber than a heterosexual parent. Sexual orientation should not, and in most cases, do [sic] not disqualify people from being considered as an adoptive or foster parent. If all people were eliminated based on an issue that someone else believed was immoral, there would be almost no a [sic] parents left. What we can all agree on is that children without loving homes deserve the opportunity to be placed with qualified parents.

The Revised Curriculum contains a second handout also entitled "Myths and Facts," which states, in pertinent part:

**Myth:** It isn't "normal" to be homosexual or have homosexual feelings.

**Facts:** Alfred C. Kinsey's landmark research beginning in the 1930's and continuing into the 1950's demonstrated that homosexual behavior occurs in this country much more frequently than people had imagined ... It is interesting to note that only a few hundred years ago, being left-handed was considered the mark of a witch, a sign of perversity. The phobia of witchcraft was so pervasive that people were tormented, even murdered simply because they were lefthanded. Such a thing may seem unbelievable, but people can do very cruel things when they are afraid. Future generations are likely to look back with equal astonishment that gay and

6

lesbian people were subjected to similar acts of fear and hatred

... Very few of us have exclusively heterosexual or homosexual feelings throughout our lives. Human sexuality is a continuum, not opposing "camps." However, this culture has rigidly indoctrinated us that even the appearance of traits that are not assigned to a person's gender role is cause for uneasiness ... People who overplay their cultural gender roles, who react negatively, or even cruelly to any deviation from these "roles", may well be driven by a need to deny their own behavior or feelings.

**Myth:** Homosexuals are sick.

**Facts:** ... One's sexual and emotional orientations are fixed at a very early age. Many experts claim at birth, certainly by age five ... Homosexuality was considered quite normal in Ancient Greece and Rome (both during their rise and decline in power), and in Native American Indian tribes where gays were elevated to very high leadership positions. Some present-day societies like The Netherlands have an accepting attitude, and in Denmark same-sex marriages are legal.

**Myth:** Homosexuality is a sin.

**Facts:** The Bible contains six passages which condemn homosexual behavior. The Bible also contains numerous passages condemning heterosexual behavior.
Theologians and Biblical scholars continue to differ on many Biblical interpretations. They agree on one thing, however. Jesus said absolutely nothing at all about homosexuality. Among the many things deemed an abomination are adultery, incest, wearing clothing made from more than one kind of fiber, and earing shellfish, like shrimp and lobster.

Religion has often been misused to justify hatred and oppression. Less than a half a century ago, Baptist churches (among others) in this country defended racial segregation on the basis that it was condoned by the Bible. Early Christians were not hostile to homosexuals. Intolerance became the dominant attitude only after the Twelfth Century. Today, many people no longer tolerate generalizations about homosexuality as pathology or sin. Few would condemn heterosexuality as immoral — despite the high incidence of rape, incest, child abuse, adultery, family violence, promiscuity, and venereal disease among heterosexuals. Fortunately, many within organized religions are beginning to address the homophobia of the church. The Nation Council of Churches of Christ, the Union of American Hebrew Congregations, the Unitarian Universalist Association, the Society of Friends (Quakers), and the Universal Fellowship of Metropolitan Community

Churches support full civil rights for gay men and lesbians, as they do for everyone else.

**Myth:** People "choose" to be gay or straight.

**Facts:** ... Most people feel that their sexual orientation is not a choice, it is a natural response for them. Trying to change one's sexual response to straight or gay is usually unsuccessful. We do have a choice regarding how we treat each other. Hatred of gay men and lesbians is the work of humans, not God. As with any other group, the majority of gay men and lesbians are good people who are concerned about the future of our country and the world. They do no ask special favors, simply the respect and rights that we all should enjoy, without fear of verbal or physical attacks ...

In April 2005, MCPS announced that the Revised Curriculum was to be tested in six pilot schools. The three pilot high schools are Bethesda Chevy Chase High School, Seneca Valley High School, and Springbrook High School. The three pilot middle schools are Martin Luther King Middle School, Tilden Middle School, and White Oak Middle School. On April 19, 2004, MCPS announced that May 5, 2005 would be the start date for the Revised Curriculum.

On May 3, 2005, Plaintiffs filed a Complaint in this Court, alleging violations of the Equal Protection Clause, the First Amendment, Substantive Due Process, Procedural Due Process, Maryland Constitution Art. 24 Due Process, and a claim of Ultra Vires. Plaintiffs submitted in conjunction with their Complaint a Motion for Temporary Restraining Order and a Motion to Waive Posting of Bond. On May 4, 2005, Defendants file a Motion to Dismiss Pursuant to Rule 12(b)(1). The Court will now rule on the instant motions.

## II.   Motion to Dismiss Pursuant to Rule 12(b)(1)

### A.   Standard of Review

The plaintiff has the burden of proving that subject matter jurisdiction exists. *See Richmond,*

8

*Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).  When a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), "the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment."  *Id.*  The district court should grant the Rule 12(b)(1) motion to dismiss "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law."  *Id.*

> **B.**     **Standing**

The jurisdiction of the federal courts under Article III is limited to those situations where a plaintiff presents to the court an actual case or controversy.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992).  Accordingly, the doctrine of standing serves to identify "those disputes which are appropriately resolved through the judicial process."  *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990).

A justiciable case or controversy requires a plaintiff who "has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf."  *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976).  As such, to establish standing, a plaintiff must demonstrate:  (1) an "injury in fact" — an invasion of a legally protected interest which is "concrete and particularized" and "actual or imminent," not "conjectural or hypothetical"; (2) a causal connection between the injury and the conduct complained of; and (3) that it is "likely," as opposed to merely "speculative," that the injury will be redressed by a favorable decision.  *Lujan*, 504 U.S. at 560-61.

This case is brought not by individual plaintiffs, but by Plaintiff organizations CRC and PFOX.  An association may have standing to sue solely as the representative of its members, even in the absence of

injury to itself.  *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 342 (1977).  An association has standing to bring suit on behalf of its members when:  (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation in the lawsuit of each of the individual members.  *Id.* at 342-43.

Although plaintiffs in Establishment Clause cases are subject to the standing requirement of Article III, the Fourth Circuit has recognized that, because of the intangible nature of the right, "the concept of injury for standing purposes is particularly elusive in Establishment Clause cases."  *Richard Suhre v. Haywood County*, 131 F.3d 1083, 1084 (4th Cir. 1997) (internal citations omitted).  In *Suhre*, the Fourth Circuit explained this dilemma as follows:

> ... the standing inquiry in Establishment Clause cases has been tailored to reflect the kind of injuries Establishment Clause plaintiffs are likely to suffer ... the Establishment Clause plaintiff is not likely to suffer physical injury or pecuniary loss.  Rather, the spiritual, value-laden beliefs of the plaintiffs are often most directly affected by an alleged establishment of religion.  Accordingly, rules of standing recognize that noneconomic or intangible injury may suffice to make an Establishment Clause claim justiciable.

*Id.* (internal citations omitted).

In *Suhre*, the Fourth Circuit found that anyone who has direct contact with an unwelcome religious display or exercise had standing to challenge the display on Establishment Clause grounds.  *Id.* at 1086.  The Court specifically noted that the plaintiffs were not required to take affirmative steps to avoid contact with the display.  *Id.* at 1088.  Relying upon Supreme Court precedent in *School Dist of Abington Township, Pa. v. Schempp*, 374 U.S. 203, 224 n.9 (1963), the Fourth Circuit explained:

> In evaluating standing, the Supreme Court has never required that Establishment Clause plaintiffs take affirmative steps to avoid contact with challenged displays or religious

10

exercises.  The student plaintiffs in *Schempp* had the option to leave the classroom during the Bible reading and prayer they protested.  They chose not to assume this special burden, yet the Supreme Court readily found that they had standing to challenge the practice.

*Id.*

In this case, Defendants argue that Plaintiff organization CRC does not have standing to sue as the organization does not include members that would otherwise have standing to sue in their own right.  The Court disagrees.  Insofar as CRC has as its members students and parents of students at MCPS who are directly exposed to the Revised Curriculum, CRC has standing.  Defendants seem to concede that CRC includes members who are students and parents of students enrolled at MCPS.  Nevertheless, Defendants argue that because these students are not enrolled in the Revised Curriculum — because they have not chosen to opt into a program that they find offensive to their religious sensibilities — they lack standing.  This argument runs contrary to the Fourth Circuit's analysis in *Suhre*, 131 F.3d at 1088.  Plainly, students who find the Revised Curriculum should not, and are not, required to assume the special burden of participating in the program merely to preserve their Establishment Clause challenge.

The Court also notes that, although Defendants do not argue with particularity the standing of PFOX, both PFOX and CRC appear to have organizational standing pursuant to their First Amendment free speech claim.  The Fourth Circuit has found that "[j]ust as a plaintiff claiming discrimination under the Fourteenth Amendment has standing to seek a level playing field, so too does a plaintiff claiming viewpoint discrimination under the First Amendment."  *Planned Parenthood of South Carolina Inc. v. B. Boykin Rose*, 361 F.3d 786, 790 (4th Cir. 2003).  Here, a member of PFOX was a CAC member and participated in the CAC hearings concerning the content of the Revised Curriculum.  Accordingly, both

organizations appear to have standing pursuant to their First Amendment viewpoint discrimination claims. As such, the Court will deny Defendants' Motion to Dismiss Pursuant to Rule 12(b)(1).

## III.   **Motion for Temporary Restraining Order**

### A.   **Standard**

A temporary restraining order is an "extraordinary remedy" and should be granted only in limited circumstances. *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (citing *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1991)). Temporary restraining order relief requires a district court to balance the following four factors:  (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied; (2) the likelihood of harm to the defendant if the requested relief is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest. *Direx*, 952 F.2d at 812. The plaintiff bears the burden of establishing that these factors favor granting the injunction. *Manning v. Hunt*, 119 F.3d 254, 263 (4th Cir. 1997).

Under this hardship balancing test, "the first two factors regarding the likelihood of irreparable harm to the plaintiff if denied and of harm to the defendant if granted are the most important." *Id.*; *see In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 526 (4th Cir. 2003) ("[e]mphasis on the balance of these first two factors results in a sliding scale that demands less of a showing of likelihood of success on the merits when the balance of hardships weighs strongly in favor of the plaintiff, and vice versa."). As such, "the first task of the district court is to determine the harm that will be suffered by the plaintiff if no preliminary injunction is entered." *Id.* The harm demonstrated by the plaintiff must be "neither remote nor speculative, but actual and imminent." *Id.* (internal citations omitted). The district court must then balance this harm against the harm which that be suffered by the defendant if the preliminary injunction is granted.

*Id.*

**B.**     <u>**Analysis**</u>

       **1.**     <u>**Irreparable Harm to Plaintiffs**</u>

"The loss of First Amendment freedoms, for even a minimal period of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  Plaintiffs allege two First Amendment violations; a free speech violation and a violation of the Establishment Clause.  The importance of protecting the fundamental constitutional freedoms in the First Amendment cannot be overstated.

The Establishment Clause serves to protect the integrity of both the Church and the State by keeping these hallowed institutions at arms length from one another.  *See McCollum v. Bd. of Edc.*, 333 U.S. 203, 212 (1948).  The Supreme Court has been a vigilant enforcer of this separation, and in particular, has taken great care to monitor and enforce compliance with the Establishment Clause in our elementary and secondary schools.  *See Edwards v. Aguillard*, 482 U.S. 578, 583-84 (1987); *see also Coles v. Cleveland Bd. of Educ.*, 171 F.3d 369, 377 (6th Cir. 1999) ("The Supreme Court's Establishment Clause jurisprudence has been remarkably consistent in sustaining virtually every challenge to government-sponsored religious expression or involvement in the public schools."); *Doe v. Beaumont Ind. Sch. Dist.*, 240 F.3d 462, 487 (5th Cir. 2001) (the Establishment Clause must be applied "with special sensitivity" in the public school setting).

Long ago, Justice Frankfurter eloquently explained the importance of patrolling the edges of the Establishment Clause in the public school setting:

> Designed to serve as perhaps the most powerful agency for promoting cohesion among a heterogeneous democratic people, the public school must keep scrupulously free from entanglement in the strife of sects.  The preservation of the community from divisive

conflicts, of Government from irreconcilable pressures by religious groups, of religion from censorship and coercion however subtly exercised, requires strict confinement of the State to instruction other than religious, leaving to the individual's church and home, indoctrination in the faith of his choice.

*People of the State of Illinois ex re. McCollum v. Board of Education of School Dist. No. 71, Champaign County, Ill.*, 333 U.S. 203, 216-17 (1948) (Frankfurter, J., concurring).

So, too, has the Supreme Court noted the importance of the First Amendment's free speech protections to the fabric of our constitution. "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't v. Mosley*, 408 U.S. 92, 95 (1972). The Court finds that the imminent threat to Plaintiffs' First Amendment rights constitutes irreparable harm.

Plaintiffs also argue that increased health risks to students once they receive the "pro-gay" message of Defendants constitute irreparable harm. This Court cannot agree. Plaintiffs' argue that homosexual sex is more dangerous than heterosexual sex, and that students at MPCS will be more likely to engage in homosexual sex if presented with the Revised Curriculum. Plaintiffs cite numerous studies demonstrating that gay men are in the highest risk groups for various sexually transmitted diseases, including HIV/AIDS, HPV, Syphilis, and Chlamydia. Plaintiffs also argue that homosexuals are more likely to have promiscuous, group, or otherwise "deviant" sex with multiple partners

At the outset, the Court questions the reliability of the studies to which Plaintiffs cite, at least one of which was performed in the 1970s. The Court is well-aware that studies on the health risks of a homosexual lifestyle are numerous and, in many cases, contradictory. Indeed, as Defendants point out, many studies conclude that lesbians are in one of the lowest risk groups for a variety of STDs, including

14

HIV/AIDS.  Moreover, the harm that Plaintiffs posit is highly speculative and attenuated.  It would require more than a few logical leaps for this Court to find that MPCS students presented with the Revised Curriculum would suddenly choose to engage in promiscuous, unprotected, homosexual sex — adhering to the Revised Curriculum's message of gay tolerance but somehow overlooking the even more forceful message of safe sex within the confines of a monogamous relationship.  This is not the type of "actual and imminent" harm sufficient to demonstrate irreparable injury for the purposes of a temporary restraining order.

For the above-stated reasons, the Court finds irreparable harm to Plaintiffs on the basis of potential restrictions to their First Amendment liberties.

## 2.     <u>Harm to Defendants</u>

In contrast, the Court is not persuaded that the imposition of a temporary restraining order will wreak any great harm on Defendants.  The Revised Curriculum, which has yet to take effect, will only be utilized in ten percent of the school district.  The remaining ninety percent of health class continue to rely upon the original sex-ed curriculum.  Defendants have presented this Court will no evidence as to why the pilot schools could not simply use the original curriculum through the end of this year, allowing the parties and this Court a chance to explore the important First Amendment questions presented by the case.  The students at issue are in eighth and tenth grade, and thus, should Defendants prevail, would have an opportunity later in their high school careers to enroll in classes teaching the Revised Curriculum. Moreover, at the hearing in this matter, Defendants were unable to state with any particularity why the issuance of a temporary restraining order would cause them harm.  For these reasons, the Court finds that Defendants would not be harmed, but would be merely inconvenienced, by the imposition of a temporary

restraining order.

### 3.      Likelihood of Success on the Merits

In determining whether or not to issue a temporary restraining order, this Court is not required to evaluate the particular strengths and weaknesses of all the claims that Plaintiffs bring before this Court.  As each claim, if successful, is individually sufficient to prevent Defendants from going forward with the Revised Curriculum, the Court will only evaluate those First Amendment claims which are at the heart of this case.

When the balance of harms tips decidedly in favor of the plaintiff, "a preliminary injunction will be granted if the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." *Direx*, 952 F.2d at 813.  As noted above, the balance of harms tips decidedly in favor of Plaintiffs; while our refusal to issue a temporary restraining order would endanger Plaintiffs' First Amendment rights, little harm would result to Defendants from such an action.  Therefore, the Court will evaluate Plaintiffs' First Amendment claims in order to determine whether they merit further and more deliberate investigation.

### I.      First Amendment - Establishment Clause

The Establishment Clause of the First Amendment provides, "Congress shall make no law respecting an establishment of religion ..."  U.S. Const., Amend. I..  As such, the Establishment Clause "was intended to erect a wall of separation between Church and State." *Everson v. Board of Educ.*, 330 U.S. 1, 16 (1947) (internal citations omitted).

In *Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971), the Supreme Court articulated a three-part test to determine whether a statute violates the Establishment Clause.  In order to pass muster under the

*Lemon* test: (1) the government's action must have a secular purpose; (2) the principal and primary effect of the government's action must be one that neither advances nor inhibits religion; and (3) the government's action must not foster excessive entanglement with religion. *Id.* at 612, 613; *see Koenick v. Felton*, 190 F.3d 259, 265 (4th Cir. 1999) (affirming adherence to *Lemon* test). Plaintiffs argue that the Revised Curriculum fails to satisfy the second prong of the *Lemon* test as it discriminates between religious sects.

"The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). Accordingly, "no State can pass laws which aid one religion or that prefer one religion over another." *Id.* (internal citations omitted); *see Zorach v. Clauson*, 343 U.S. 306, 314 (1952) ("[t]he government must be neutral when it comes to competition between sects."); *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968) ("The First Amendment mandates governmental neutrality between religion and religion ... The State may not adopt programs or practices ... which aid or oppose any religion.... This prohibition is absolute.") (internal citations omitted). The Supreme Court has found that discrimination against religious speech among religions is subject to strict scrutiny. *See Larson*, 456 U.S. at 246 ("when we are presented with a state law granting a denominational preference, our precedents demand that we treat the law as suspect and that we apply strict scrutiny in adjudging its constitutionality.").

In this case, Plaintiffs allege that the Revised Curriculum discriminates between religious sects in that it prefers those sects that are friendly to the homosexual lifestyle. The Revised Curriculum notes that "Fundamentalists are more likely to have negative attitudes about gay people than those with other religious

17

views." The Revised Curriculum also paints certain Christian sects, notably Baptists,[3] which are opposed to homosexuality, as unenlightened and Biblically misguided:

> Religion has often been misused to justify hatred and oppression. Less than half a century ago, Baptist churches (among others) in this country defended racial segregation on the basis that it was condoned by the Bible. Early Christians were not hostile to homosexuals. Intolerance became the dominant attitude only after the Twelfth Century.

The Revised Curriculum plainly portrays Baptist churches as wrongly expressing the same intolerance attitude towards homosexuals today as they did towards African Americans during segregation. The Revised Curriculum states that this attitude towards homosexuality is based on generalized arguments that most modern day people reject: "Today, many people no longer tolerate generalizations about homosexuality as pathology or sin."

The Revised Curriculum also implies that the Baptist Church's position on homosexuality is theologically flawed. The materials state that theologians and Biblical scholars agree that "Jesus said absolutely nothing at all about homosexuality." The materials also note that many seemingly innocuous activities were deemed abominations by the Bible, such as "wearing clothing made from more than one kind of fiber, and earing [sic] shellfish, like shrimp and lobster," inviting the reader to draw the conclusion that not all activities that were banned in the Bible are still morally objectionable today. The Court would again note that the strength Defendants' substantive theological arguments are irrelevant — it is their exclusive nature that the Court finds troubling.

Most disturbingly, the Revised Curriculum juxtaposes this portrait of an intolerant and Biblically

---

[3]The Revised Curriculum also notes that fundamentalists and evangelicals are more likely than other religions to have negative attitudes about gay people. The Revised Curriculum contrasts this view with view of "more tolerant religious backgrounds."

misguided  Baptist Church against other, preferred Churches, which are more friendly towards the homosexual lifestyle.  The Revised Curriculum states:

> *Fortunately*, many within organized religions are beginning to address the homophobia of the church.  The Nation Council of Churches of Christ, the Union of American Hebrew Congregations, the Unitarian Universalist Association, the Society of Friends (Quakers), and the Universal Fellowship of Metropolitan Community Churches support full civil rights for gay men and lesbians, as they do for everyone else.

(emphasis added).

The Court is extremely troubled by the willingness of Defendants to venture —or perhaps more correctly bound — into the crossroads of controversy where religion, morality, and homosexuality converge.  The Court does not understand why it is necessary, in attempting to achieve the goals of advocating tolerance and providing health-related information, Defendants must  offer up their opinion on such controversial topics as whether homosexuality is a sin, whether AIDS is God's judgment on homosexuals, and whether churches that condemn homosexuality are on theologically solid ground.  As such, the Court is highly skeptical that the Revised Curriculum is narrowly tailored to serve a compelling government interest, and finds that Plaintiffs' Establishment Clause claim certainly merits future and further investigation.

## II.    First Amendment - Freedom of Speech

The First Amendment of the Constitution declares that "Congress shall make no law ... abridging the freedom of speech."  U.S. Const., Amend I.  As Defendants note, delivery of curriculum by a teacher in a public school classroom is government speech that occurs in a non-public forum.[4]  As such, the

---

[4]Plaintiffs do not argue, although such an argument is possible, that in inviting outside speakers into the classroom, Defendants converted the classroom from a non-public forum into a limited public

government may regulate the content of this speech, provided that such regulations are (1) reasonable and (2) viewpoint neutral. *See Warren v. Fairfax County*, 988 F.Supp. 957, 962 (E.D.V.A. 1997) ("Access to a non-public forum ... can be restricted as long as the restrictions are reasonable and are not an effort to suppress expression merely because public officials oppose the speaker's view.") (quoting *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985)).

Viewpoint discrimination consists of state action in which "there is no ban on a general subject matter, but only on one ore more prohibited perspectives." *Warren*, 988 F.Supp. at 966 (citing *Rosenberger v. Rector & Visitors of the Univ. of Virginia.*, 515 U.S. 819, 831 (1995)). When government restrictions "target not subject matter but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination." *Rosenberger*, 515 U.S. at 829 ("the government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.").

In this case, Defendants open up the classroom to the subject of homosexuality, and specifically, the moral rightness of the homosexual lifestyle. However, the Revised Curriculum presents only one view on the subject — that homosexuality is a natural and morally correct lifestyle — to the exclusion of other perspectives. Indeed, the Revised Curriculum advises teachers that the information concerning homosexuality is to be presented to students as facts and that "no additional information, interpretation or

---

forum. However, for purposes of this analysis, the distinction is one without meaning, as regulations on both non-public and limited public forums must be viewpoint neutral, and Plaintiffs do not raise a content discrimination argument in this case.

examples are to be provided by the teacher." As such, the Court is deeply concerned that the Revised Curriculum violates Plaintiffs' free speech rights under the First Amendment, and believes that Plaintiffs' free speech allegations merit future and further investigation.

### 4.   **Public Interest**

The Court finds that the public interest is clearly served by protecting the First Amendment rights of Plaintiffs. Additionally, the public interest is served by preventing Defendants from promoting particular religious beliefs in the public schools and preventing Defendants from disseminating one-sided information on a controversial topic. In contrast, the Court is not persuaded that a decision for Defendants would protect any substantial public interest. Therefore, the Court finds that the public interest factor weighs decidedly in favor of Plaintiffs.

## IV   **MOTION TO WAIVE BOND**

Plaintiffs request that this Court enter an order waving the requirement of posting security in order to obtain a temporary restraining order or preliminary injunction pursuant to Federal Rule of Civil Procedure 65. In support of their motion, Plaintiffs aver that Plaintiffs, non-profit organizations, are represented by a non-profit, public interest organization, Liberty Counsel, and that the issuance of a temporary restraining order would not result in financial harm to Defendants. The Court has not been presented with any evidence nor does it believe that Defendants will be harmed by the imposition of a temporary restraining order. As such, the Court will grant Plaintiffs' instant motion.

## IV.   **CONCLUSION**

Long ago, Justice Brandeis wrote that "the greatest menace to our freedom is an inert people," and therefore the righteous end of the State was to make our people "free to develop their faculties." *Whitney*

21

*v. California*, 274 U.S. 357, 375 (1927) (Brandeis, J., concurring).  The wisdom of approving a curriculum which prohibits students from discussing one viewpoint of a controversial subject goes to the very essence of that First Amendment faith.  The merit of Plaintiffs' viewpoint — be it right, wrong, discriminatory, or just — is of no consequence.  Rather, the Court is concerned with ensuring that Plaintiffs' free speech rights are not restricted merely because they voice an unpopular viewpoint.  No matter the importance of an idea to its believers, or how objectionable it may be to its detractors, the diversity of our democratic fabric is sewn together by the belief that the path to freedom lies in the opportunity for rival positions to be equally heard and discussed.

So, too, will this Court fiercely protect the First Amendment freedoms enshrined in the Establishment Clause.  The Establishment Clause "rests upon the premise that both religion and government can best work to achieve their lofty aims if each is left free from the other within its respective sphere." *McCollum*, 333 U.S. at 212.  Accordingly, this Court has strived to "chart a course that preserves the autonomy and freedom of religious bodies while avoiding any semblance of established religion." *Walz v. Tax Commission*, 397 U.S. 664, 672 (1970).

This case pits a potential loss of Plaintiffs' First Amendment freedoms against what amounts to mere inconvenience to Defendants.  It is in the public interest for the Court to guard against any chipping away at Plaintiffs' First Amendment freedoms, particularly where Plaintiffs have shown a strong likelihood of success on the merits.  As such, for the aforementioned reasons, the Court will grant Plaintiffs' Motion for a Temporary Restraining Order [2].  Additionally, the Court will grant Plaintiffs' Motion to Waive Posting of Bond [3] and deny Defendants' Motion to Dismiss Pursuant to 12(b)(1).  An Order consistent with this Opinion will follow.

May 5, 2005                                  /s/
Date                                 Alexander Williams, Jr.
                                     U.S. District Judge